I'd like to reserve three minutes if I might. My name is Tony Mary. I'm representing the appellant here, Tammy Russell. We're here on a following a decision, an adverse decision on a motion for summary judgment. Two of the tenets of summary judgment are that evidence is construed in favor of the non-movement and the court should leave the fact finding to the jury. We're here because we think that district court in this case missed on both of those. Particularly the district court held that as a matter of law Tammy Russell's work performance justified the adverse actions that were taken against her. We think there's a wealth of evidence that a jury could find that Tammy's work performance didn't have anything to do with the actions that took place. I just don't understand how you can say that and let me tell you why so it'll give you a chance to to address at least what my concern is. In a lot in most of these cases I would say there's a factual dispute about whether the employee was a good employee or not such a good employee but here as I read this your client admits consistently that she had performance problems and the whole her whole position is directed at trying to these problems. Well you made me do it or well my son's conditioned me caused me these problems and everything else but there seems to be no fundamental dispute here that she was having difficulties getting her work done on a timely basis. Assuming that that's the case and I'm just telling you that's how I read this then I don't see how you win on pretext. It seems that it seems like that distinguishes this case from almost all the ones that we see and we see a I'd appreciate your view on that. I appreciate you directing me to where you'd like to go. A couple points on that. There are volumes and volumes of comments that Tammy made with respect to the critiques. Some of which she honestly admits that yeah I was behind in this or I was behind in that. That's point one. So she does admit to some deficiencies in performance were related at all to the actions that were taken. In fact some of the actions that were taken contributed to the deficiencies for example the failure to give her credit hours. Credit hours exist for people who have trouble managing their time because of illness or whatever and that would have helped her catch up. You're talking about particularly December of 2006. I think that's right because again there's a lot of stuff in here about gee you have to go back a year and she had a satisfactory performance review at a certain time and so on and so forth. All of which seems to be accurate but your whole argument seems to be premised on once deemed satisfactory somebody can't become unsatisfactory until the time of the next review and that can't possibly be true. So it sounds as if she had problems, she corrected them, she had problems, she corrected them and then you get to December the problems come back again and they said enough is enough. Okay well let me respond to that by saying under the national contract I think your premise is incorrect your honor. Once you're deemed satisfactory you're deemed satisfactory until the next review barring something I assume outrageous. But the point here is she was deemed satisfactory in November. So you get a performance review on January 1st you can just stop doing your work because you're insulated for the next 363 days. That's your argument. No I assume there's a process under the national contract that you can take some formal action consistent with the national contract to address those. Our point here with respect to the national contract is they didn't do that. We have here a performance appraisal in January that says her performance was fine and the importance of the national contract is that can be grieved. So there's got to be some objective evidence because if there's no objective evidence you'll get the grievance reversed. So we have an objective evaluation in January on a point system, January of 2007 I believe, that says she was objectively qualified. Then we've got a withholding of a promotion in February based on poor performance, based upon Mr. Meyer's statement of poor performance. And then we've got the next annual review is fine. And then we've got some non-grievable notes in there that your performance isn't very good. And then we've got the next annual review that's fine. Plus this is a credibility contest between, to a great degree, between Tammy Russell and Paul Meyer. And let me say I'd like to read you from, if I might, from Mr. Meyer's deposition. You'll recall that he submitted a TIGDA affidavit in support of Margaret Peters when she interfered with taxpayer, private confidential taxpayer information in Tammy's files. And she was defending against her own discipline. Mr. Meyer submitted an affidavit in support of her. Now I ask him in his deposition, and this is at page 245 of the transcript, page ID 245, it's in document 29-2, page 16, line 11. Are you aware that Margaret Peters was the subject of a TIGDA investigation regarding her entering into or obtaining access to Tammy's confidential claim files? Answer, I wasn't aware. Question, so no one asked you for an affidavit or statement with respect to that? Answer, no sir. Two flat lies. Under oath. So if this is a credibility contest between Paul Meyer and Tammy Russell, we get a jury to hear that evidence. Let me focus you a little bit differently. Sure. There is, see if you accept this premise, there's an appropriate differentiation to be made between employer concern and employer displeasure, with an employee's absences that interfere with her ability to do work in a timely way. And then the other issue of whether the employer displeasure over the work has anything to do with the association with the relative, in this case the son, with a disability. Correct. It's entirely appropriate for the employer to be concerned about the lack of timeliness in getting the work done, whatever the reason, right? Correct. What's the evidence here that the employer's concern was focused on the reason for the lack of timeliness, i.e. the need to care for the son, rather than just the fact of a lack of timeliness, a lack of proper attention to matters? Okay, I think our best evidence on that particular point comes from a couple of places. First, there was a meeting in May of 2007, where Ms. Van Order was present, Ms. Russell was present, Mr. Meyer were present. When Ms. Van Order was present, she kept referring to somebody with your issues, somebody with your issues, which Tammy clearly understood to mean, I've got a disabled child, I'm going to miss work. But what about that object prompts that conclusion? That's your client's subjective view. But we all know that there's a good body of law, that her subjective view doesn't get you very far in getting to the jury. I mean, what's the evidence that says issues doesn't refer to the on-job issues? Or perhaps issues even refers to a sympathetic view of the reasons, the underlying reasons that Ms. Russell might have been absent. Then I think you go to Ms. Van Order's take the affidavit. This is, once again, in the Margaret Peters thing, where she goes on and on about how Tammy made such a big deal of wanting time off for her son. And she had this issue with, she had an autistic son, and there are paragraphs. So we should look at that affidavit. I think the affidavit is unambiguous that Mrs. Van Order, and Meyer mentions it too, it was unambiguous that they weren't happy that Tammy continually pressed for leave time for her son. That she made it a big deal. And I started out my brief by saying these are old school IRS people. They had always done what they always did and they weren't going to be bothered by the law. That was their reputation. So I gather you concede that perhaps these issues does not get you as far as you'd like. But you believe the thing that creates the issue of fact concerning the relationship between their actions and the association with the son is the affidavits in the Peters matter? Yes. I think if you aren't going to accept Tammy's understanding of the meeting, that's fine. I don't think case law permits her personal belief to create a factual issue in that kind of matter. Okay. And I would agree with respect to the issue of discrimination, I think the TIGTA affidavits get us to the jury on that question. With respect to the retaliation, I don't know that there's a clear argument on the other side that they weren't aware that she was engaged in a protective activity when they undertook to. That's where the threat of termination comes in and everything else. Most of the adverse action we're talking about here occurred after the EEO filing. The events that depend upon us linking the discriminatory animus is principally the denial of the credit hours in December and the one withholding of a promotion in February of 2007. After that, she filed her EEO and then we had the notice of termination which caused her to miss two promotions and withheld pay and that sort of stuff. I don't really think there's any doubt that we've not tied up the prima facie case on the retaliation point. I'd like to spend a moment on the, obviously we're up here because the court tossed us on the pretext issue. The court found that we identified adverse actions but I wanted to, we've disputed the district court's point on a couple, one being the FMLA issue. But the denial of FMLA, the notion that you're not going to get any more FMLA, that can be an adverse action depending on the reason. I think if they want to say it's because of this reason, then we go to pretext and business judgment. But the other one is the credit hours and I see my time has expired. Ms. Rogers. Good morning. Kim Robinson for the United States. I'll focus this morning on pretext. The Manzer standard which indicates she has to prove the sheer weight of the evidence, sheer weight of the circumstantial evidence is more likely than not that discriminatory motive was the real reason for the adverse actions. I think it's impossible for her to be well documented, uncontested, poor performance that you noted. There's certainly a lot of evidence for that. The comments in the affidavits are unlinked to the adverse actions here. They are, the affidavits were given in 2009 and they never discuss the decision not to do it. Well, they could be more general. They could be taken as indicative of attitude at an earlier point in time. So, I mean, I don't know that saying they're later and that they don't discuss the particular employment actions at issue here really has much to do with the point for which they're being argued. They certainly could be evidence that they were annoyed at an earlier period, but I don't think that's sufficient to show pretext. In MWALA, which we cite in our brief, which is the closest facts I saw on the Sixth Circuit, there was some discussion of protected activity at a meeting for termination, how the protected activity annoyed the supervisors and the employee was immediately terminated. I think just discussion of an employer's annoyance at protected activity is not enough to get Ms. Russell anywhere here. In addition with those affidavits, I'd like to point out that there's no real argument that they're relevant to the discrimination claim. They mentioned her son's disability once very briefly. They discussed the EEOC claim a couple of times, but the retaliation claim is only relevant to the recommendation that she be terminated. She began her EEOC activity after the decision not to promote her. With regards to pretext, I would point this court to Manzer and the standard there. I agree with you, Judge McKee, that the poor performance here is uncontested. Are there any questions for me? Apparently not. Then I will rest on my briefs. Thank you. Your Honor, I didn't hear anything that screamed for a rebuttal on my end, so if there are any questions for me or anybody else, I'll pass. Okay. Well, thank you both for your argument, and we'll consider the case carefully.